# 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡

## Davis Elkins and Bristol Natural Gas Corporation v. Industrial Gas Corporation.

December 6, 1943.

Record No. 2664.

Present, All the Justices.

The opinion states the case.

*Donald T. Stant* and *Bradley Roberts,* for the appellants.

*George M. Warren, H. E. Widener, Frank R. Hurlbutt* and *George W. Hurlbutt,* for the appellee.

CAMPBELL, C. J., delivered the opinion of the court.

Appellant, Davis Elkins, filed his original bill of complaint against Bristol Natural Gas Corporation and Industrial Gas Corporation, Virginia corporations with their principal offices in Bristol, Virginia. Subsequently, he filed an amended bill and the East Tennessee Light and Power Company was made a party defendant. This latter defendant is not primarily interested in the questions involved in this litigation. The parties will hereafter be referred to as Elkins, Bristol and Industrial.

The record sets forth these facts: Elkins, in the year 1937, was the owner of certain oil and gas leases, leasehold estates, rights, gas wells, drilling equipment and other personal property located in the counties of Scott and Washington, in the State of Virginia. While the owner thereof, Elkins, on the 10th day of April, 1937, executed a deed of trust to Grover F. Hedges and Arthur B. Hodges, trustees, for the purpose of securing John C. Adams and Company in the gross sum of $12,000 evidenced by two notes for money advanced to Elkins which was used in drilling for gas. On November 24, 1941, Donald T. Stant was substituted as trustee in the place and stead of Hedges and Hodges, trustees.

Subsequent to the execution of the deed of trust, Elkins secured a charter for the Bristol Natural Gas Corporation, to which he assigned the various properties heretofore referred to, for a consideration of five hundred shares of its capital stock. This assignment was subject to the John C. Adams Company debt. By proper corporate action, Bristol accepted the conveyance, subject to the stipulations and conditions mentioned therein.

On November 29, 1937, Bristol and Industrial entered into an agreement by which Bristol sold and agreed to deliver to Industrial, a commercial dealer in gas, natural gas produced from the leases therein described until January 1, 1948, and as long thereafter as gas was produced in paying and marketable quantities, unless the agreement was sooner terminated. Thereafter, a supplemental agreement was entered into by Bristol and Industrial.

The supplemental agreement is primarily concerned with the drilling of additional wells. Under the first paragraph Bristol agrees to drill not exceeding four wells, one at a time, only after gas sales show an insufficient reserve as therein defined. The second paragraph modifies the first to the extent that if Bristol drills any two wells, successively or otherwise, which are abandoned because gas cannot be produced therefrom in paying quantities, Bristol shall not be required to drill any further wells. Under the third paragraph, if Bristol fails to drill as required by the first paragraph, or the event covered by the second paragraph occurs, Industrial has the right to drill wells until the four have been completed, to continue drilling others so long as necessary to maintain the reserve, and to charge Bristol the total cost of drilling and completing every well drilled by Industrial. Paragraph 4 makes the cost of any wells completed by Industrial under paragraph 3, as well as all other wells at any time drilled by it, additional advances and loans, and provides that all the terms of paragraph 5 of the principal agreement providing for repayment of the $12,000 advance shall apply to the cost of such wells, but makes the lien for such advances subject, first, to the $12,000 advance, and, second, subject to the debt secured by the Hedges and Hodges deed of trust.

Subsequent to the execution of this agreement, Industrial complained of a shortage of gas and called upon Bristol to dig an additional well. Bristol proceeded to do this, but in the meantime the situation as to the gas shortage became so acute that Industrial, in order to carry out its contract with the East Tennessee Light and Power Company, began

to dig a well known as "Number 8." This action was taken under the alleged right to do so, as provided in the supplemental agreement. During the progress of drilling well No. 8, Industrial withheld all payments for gas to Bristol and applied the sums due to the cost of digging No. 8. Thereupon, Bristol proceeded to cancel the contract under the provision of Clause 13 of the principal agreement.

On November 29, 1941, this suit was instituted. Its object is to obtain a declaratory judgment as to the rights of the parties under the provision of the several contracts and deeds of trust.

Answers were filed by the respective defendants. The cause was then heard on April 1, 1942, upon evidence taken in open court and upon exhibits filed by agreement of the parties.

On June 5, 1942, the chancellor entered a decree in the nature of a declaratory judgment, by which it was adjudged that the indebtedness secured by the deed of trust from Davis Elkins to Hedges and Hodges, trustees, dated April 10, 1937, had been fully paid, so far as the rights of Industrial Gas Corporation were concerned, and the lien of said deed of trust discharged; that Industrial has a lien under the principal agreement and supplemental agreement between it and Bristol for the repayment of the cost of drilling and completing well No. 8, prior in order to the lien of the deed of trust from Bristol Gas Corporation to D. T. Stant, trustee, dated May 31, 1941; that the monthly payments for gas purchased by Industrial from Bristol, after paying over to the latter the "aggregate amount of lease rentals, taxes and operating labor and repairs" may be retained by Industrial and applied to the repayment of such cost, etc., as provided by paragraphs 5 and 4 of the principal and supplemental agreements; that Bristol recover of Industrial the principal sum of $2,764.50, this being the amount due for gas purchased by Industrial; that the principal agreement dated November 29, 1937, and the supplemental agreement dated December 13, 1938, between Bristol and Industrial are subsisting and binding obligations between the parties; that the

lien of the deed of trust from Bristol to Stant, trustee, is subordinate and subject to all rights and interests acquired by Industrial under the two said agreements; and that the injunction prayed for be denied.

Appellant Elkins relies upon the following assignments of error:

"First: The court erred in holding that Industrial has a lien under the two agreements for repayment of the costs of drilling well No. 8 prior to the May 31, 1941, deed of trust and in the holdings incidental thereto.

"Second: The court should have declared the contracts properly cancelled, and removed them as a cloud upon Bristol's title.

"Third: The court erred in holding that the $12,000 Adams notes secured by the Hedges and Hodges deed of trust had been paid and the lien discharged, and in failing to hold that Elkins is the holder thereof and entitled to the benefit of the lien."

To incorporate in this opinion the full text of the various agreements and the voluminous correspondence filed as exhibits in this case would serve no good purpose and only tend to confuse the issues.

A careful examination of the record clearly shows there is no merit in the first assignment of error.

The crux of the two agreements entered into by Bristol and Industrial is found in paragraphs three and four of the supplemental agreement and are as follows:

"If, for any reason, the Seller shall fail to commence or complete any well required to be drilled by it, pursuant to the provisions of paragraph First hereof, or if Seller shall have drilled any two wells, both of which shall have been abandoned upon completion, pursuant to the provisions of paragraph Second hereof, and shall not thereafter voluntarily continue the drilling of additional wells, then in either of such events, Buyer shall have the right, at its sole option, from time to time, to carry out the procedure set forth in paragraph First hereof, and if the four wells mentioned in paragraph First shall be completed as provided therein by

either the Seller or Buyer, and a sufficient gas reserve, as therein defined, shall not thereby be developed and thereafter maintained; then the Buyer shall have the right at its sole option, from time to time, to drill additional wells to develop and maintain such gas reserve, and said Buyer shall thereupon have the right, which is hereby expressly granted by Seller, to charge to Seller the total cost of drilling, equipping, shooting and completing each and every well drilled by Buyer hereunder, and to recover such total cost together with interest thereon at the rate of six percent (6%) per annum, as provided in the next succeeding paragraph."

Paragraph 4 reads:

"The total cost of drilling, equipping, shooting and completing each and every well which may be drilled by the Buyer under the provisions of paragraph Third hereof, as well as all other wells at any time drilled by the Buyer, shall be considered and treated as, and shall constitute additional advances in payment for gas to be delivered under the Principal Agreement, and additional loans thereunder by the Buyer to the Seller, and shall become and be subject to all of the provisions of paragraph 5 of the Principal Agreement to the same extent as if expressly set forth therein, so that all of the provisions of said paragraph 5 of the said Principal Agreement, providing for the repayment and the securing of the repayment of the Twelve Thousand ($12,000.00) Dollars mentioned therein shall apply with equal force and effect to the total cost of drilling, equipping, shooting and completing each and every well which may be so drilled by Buyer."

The correspondence filed as exhibits, as well as the testimony of W. O. Clarkson, a witness for appellant, clearly shows that the production of gas by Bristol was at a minimum. Industrial was being urged by its purchaser, the Power Company, to comply in full with its contract to furnish it gas to meet the needs of its customers. Repeated efforts were put forth by Industrial to prevail upon Bristol to dig additional wells, but without avail. It was under these conditions that Industrial proceeded to dig well No. 8.

The technical defense urged by Bristol—that it was then engaged in digging well No. 7 and under the agreement it was required to dig one well at a time—should be given no recognition in a court of equity.

The plain meaning of the contract was that Bristol should furnish Industrial sufficient gas to meet its needs. This, Bristol was unable to do and thus Industrial was forced to dig well No. 8 in order to keep its contract with its customers.

■ There is no merit in the second assignment of error.

Since we are of opinion that at the time of the institution of this suit a *bona fide* dispute existed between Bristol and Industrial as to their rights under the said agreements in regard to the cost of drilling well No. 8, it would be inequitable to cancel said contracts at this time. The question of cancellation will arise should Industrial default in the payment of the sum finally adjudged to be due Bristol.

■ The third assignment of error is also without merit.

The evidence sustains the trial court's conclusion that so far as Industrial is concerned, the indebtedness of $12,000 (evidenced by the two notes referred to herein as the Adams notes), secured by the deed of trust of April 10, 1937, to Hedges and Hodges, trustees, has been fully paid and discharged.

By the assignment of May 4, 1937, Elkins conveyed the property therein described, subject to the lien of the above deed of trust, to Bristol, in exchange for 500 shares of its fully paid capital stock. Bristol agreed, under the terms of the assignment, to pay all land rentals and other charges and obligations arising out of the leases to Elkins; but it did not assume the payment of the $12,000 lien.

The resolution of the directors of Bristol authorizing an acceptance of the assignment, according to the recorded minutes of their meeting, recites that the consideration passing from Bristol, in addition to the stock, was its assumption of all obligations of Davis Elkins under the leases and "all other obligations of Davis Elkins of every

kind and character which have been incurred by him in and about securing the said leases and drilling done and drilling about to be commenced," and "subject to notes aggregating twelve thousand dollars ($12,000), secured by deed of trust from Elkins to Grover F. Hedges and Arthur B. Hodges, trustees."

In the principal agreement between Bristol and Industrial, no reference is made to that deed of trust. The supplemental agreement, however, refers to the deed of trust, but undertakes to subordinate it to advances of money theretofore made by Industrial, while giving it priority over subsequent advances to be made by Industrial. The supplemental agreement provides for payment by Industrial to the Adams Company of the full purchase price of gas due by Industrial to Bristol until the Adams notes are paid, and to that end assigns the total purchase price for such gas to Adams Company.

Thus, we see that there was no assumption of the notes in the assignment of the property, none in the corporate action of Bristol accepting the assignment, and only a conditional and qualified assignment in the supplemental agreement of December 13, 1938, some months after the date of maturity of the notes.

No payments were made on these notes by reason of the supplemental agreement.

Elkins, as the sole stockholder of Bristol, authorized and affirmed its corporate action in effecting the assignment of May 4, 1937. He signed the two agreements between Bristol and Industrial as the president of the former.

By reason of the peculiar relationship of Elkins to Bristol, there was not in 1937, any benefit to be expected by him by an assumption of the notes by Bristol. The reference to the lien in the assignment was merely, at best, evidence that the corporation had notice of it. The reference in no wise affected its validity or priority as a lien. It disclosed that Bristol could not take an absolutely clear title to the property until the lien had been released, and if it desired

that it be released it would have to make some provision for its payment or cancellation.

As we have seen, all of the capital stock of Bristol was owned at all times by Elkins. He completely controlled, dominated, and supervised its policies and operations. While Bristol held title to its property through the fiction of corporate entity, in substance and effect, all of its holdings belonged to Elkins through his total ownership of all of its capital stock.

On July 6, 1939, Elkins wrote to Adams Company as follows:

"You hold two notes of mine for $6,000 each, which notes please forward to the Dominion National Bank, Bristol, Virginia, who have been instructed to pay same, including interest due thereon. Please advise when the notes are sent to the Dominion National Bank."

The Adams Company promptly had an Arkansas bank, to whom the notes had been pledged as security, forward them for payment. The principal of the notes, with interest in the sum of $145.59, was collected by the Dominion National Bank from Elkins on July 13, 1939, and sent to the Arkansas bank. *After taking the notes*, Elkins, by his counsel, sought until June 14, 1940, through considerable correspondence, to get the Adams Company to endorse on them an assignment to him. When the Adams Company finally refused to do this, the treasurer of Bristol, at Elkins' request, made the following endorsement on each of them:

"This note, having been assumed by the undersigned, and having been paid by Davis Elkins at the request of the undersigned, on account of its inability to do so, belongs to him as of July 13, 1939, the date of such payment.

Bristol Natural Gas Corporation
by T. Frank Burk, Treasurer."

This subsequent action did not alter the circumstances existing at the time of the payment of the note by Elkins.

Elkins was president of the corporation until March 26, 1941, when he was succeeded by T. Frank Burk. Burk was also the treasurer of the corporation, and kept its books and records. He testified that prior to the payment of the Adams notes by Elkins they were carried on Bristol's books as a liability in notes payable; but when Elkins paid them they were taken out of the notes payable account and credited as an open account due Elkins for an advancement to the corporation. He reaffirmed this procedure several times in his testimony, stating that the money advanced had never been repaid to Elkins.

If, as the foregoing facts strongly tend to show, Elkins was, at all times prior to the payment of the notes, the primary obligor, then their payment by him satisfied and discharged the lien.

It is not necessary, however, to rely on this phase of the case for our conclusion. We agree with the trial court that the documentary evidence in the case shows that, even though Elkins may have become the owner of the notes under circumstances entitling him to subrogation, Bristol had settled the amount due Elkins. The assignment from Elkins to Bristol and the corporate minutes of the corporation show that all the assets of the gas development, subject to the lien of the deed of trust of April 10, 1937, were conveyed by Elkins, in exchange for 500 shares of the capital stock of Bristol.

The ledger sheets of the corporation carrying the account between it and Elkins show that Bristol credited Elkins with $80,818 for the assets; but entered a charge against him for the stock in the sum of $50,000 only. The corporation did not agree to pay $80,818 for the assets acquired. It exchanged its stock for these assets. Whatever the value of the assets, the stock was considered of equal value. One balanced the other. Bookkeeping figures could not properly increase the indebtedness of the corporation $30,818. The entries, value of the assets and value of the stock delivered in exchange therefor, should be exactly the same.

The record shows that Elkins advanced moneys to Bristol from time to time in furtherance of its activities, and that on several occasions Bristol repaid him, at least in part, for such advances. The account, starting off with a credit of $80,818 to Elkins and a debit of $50,000 against him showed a difference of $30,818, which should be deducted from the annual debit balance of Bristol. The amount of the Adams notes with interest, $12,145.59, was credited to Elkins by Bristol in its ledger account as of July 22, 1939. With these proper credits and charges, the last entry on the ledger sheets of the account between the two parties, as of February 28, 1941, shows Bristol with a small credit balance, as between it and Elkins.

Elkins having received credit for. the payment of the notes by him, the indebtedness evidenced thereby was, as between Elkins and Industrial, fully cancelled and extinguished. Whether or not Bristol, controlled by its sole stockholder, is willing to permit Elkins to make a further charge against it is a matter between it and Elkins. As between Elkins and Bristol, it makes no difference to either of them. Whatever affects Bristol affects Elkins. It is a matter of in which pocket he carries his assets.

The decree complained of is without error and is, therefore, affirmed.

*Affirmed.*

BROWNING, J., dissenting.

I am not in agreement with the conclusion of the majority opinion as to the legal status of the indebtedness represented by what are known as the Adams' notes.

The case presents a number of complicated incidents and circumstances and its importance, I think, justifies more than a scant enumeration of the facts, therefore I shall restate them. An accurate knowledge of the setting seems to me necessary to evaluate intelligently the application of the

principles which should govern the determination of the issues.

During the period from 1930 to 1937 Davis Elkins, who is frequently referred to as Senator Elkins, he being an erstwhile member of the United States Senate from the State of West Virginia, acquired a number of leases in Scott and Washington counties, Virginia, for the purpose of developing and operating what is known as a "wild cat" gas field. He drilled four wells, three of which proved to be productive.

On April 10, 1937, he executed a deed of trust conveying all of his leases and all wells and all rights connected therewith and all equipment to Grover F. Hedges and Arthur B. Hodges, Trustees, to secure to John C. Adams & Co., Inc., of Delaware, the payment of all sums advanced by the said corporation to the extent of $12,000, which was evidenced by two notes aggregating that sum. This deed of trust contains a number of clauses which, perhaps, need not now be specifically mentioned except to say that it is recited that the said Elkins had given an option to J. C. Blair, of West Virginia, to purchase the gas and that in the event this option was exercised that 10¢ per 1000 cubic feet of the sale price would be applied to the payment of the indebtedness referred to, and that the said Elkins assigned and transferred to the Adams corporation the said portion of the purchase price for the purpose of its application to the discharge of the indebtedness secured under the trust deed, and that in the event that the said Blair exercised the said option and entered into a contract pursuant thereto then Elkins would be released from any personal obligation for the payment of the said indebtedness. But the trust deed gave him the right, nevertheless, to pay such indebtedness and have the same released.

Thereafter Elkins effected a corporation, known as Bristol Natural Gas Corporation, with its principal office in Morgantown, West Virginia, to which he transferred and assigned the property referred to, the consideration therefor being 500 shares of its capital stock. This assignment was sub-

ject to the notes aggregating $12,000, payable to the Adams corporation and secured by the aforesaid deed of trust. The assignment was executed by Elkins and wife and the Bristol Natural Gas Corporation, by Davis Elkins, president.

It is well to note here that the shares given to Elkins by the Bristol corporation represented its entire issue of stock. It appears that Elkins became president of the corporation and that T. Frank Burk, an employee of Elkins, was the Vice President, Secretary and Treasurer, and, incidentally, he succeeded Elkins as president. It is what is known as a one man corporation.

Thereafter, on November 29, 1937, this corporation, which will hereafter generally be referred to as "Bristol" or "seller," entered into a contract with Industrial Gas Corporation, another Virginia corporation, which will hereafter be generally referred to as "Industrial" or "buyer", by which it is agreed to sell to the buyer such gas as it could take under the terms of the agreement at a specific price per thousand cubic feet, qualified by various conditions and stipulations, to the number of 24, certain ones of which will be specifically commented upon and referred to presently.

Subsequently, to be exact, on December 13, 1938, the seller and the buyer entered into a supplemental agreement which, as its designation indicates, was to run along with the principal agreement, modifying it in some respects and explanatory of it in other respects, and where there was conflict between the two the supplemental agreement was to obtain, otherwise the principal agreement would remain in full force and effect. The supplemental agreement, in a way, introduces a third corporation into the picture, viz: East Tennessee Light and Power Company of Bristol, Virginia-Tennessee, as the larger prospective consumer of the gas to be supplied by the buyer. The pending contract between the buyer and, as I shall hereafter refer to it, the power company, was to cover the period of ten years, during which the buyer would furnish and deliver to it its gas requirements covering the Bristol, Virginia, and Bristol, Tennessee, area, including their environs.

The dominant note running through both agreements was that the seller would live up to and perform its undertaking to deliver to the beginning of the buyer's pipe line at the fields of the seller a sufficient quantity of gas to supply the needs of the buyer in its obligation to deliver the gas to the measuring stations of the power company at the city of Bristol. In order to do this the flow of gas from the wells had to be of sufficient volume to attain a pressure of 100 pounds at the metering station of the buyer. The three wells which were being operated at the time and which continued until about the beginning of 1941, met this pressure requirement. Two additional wells had been drilled by the seller. No. 5 was started January 3, 1938 and completed April 25, 1938, and No. 6 was started August 7, 1939, and completed February 20, 1940.

In March, 1941, there was a distinct subsidence of the pressure requirement resulting in a depleted and decreased quantity of gas delivered by the seller to the buyer and in turn by the buyer to its consumers. This naturally caused consternation to the buyer for it was forced to cut off the supply to some of its customers. So vital was it to the power company that it had to draw on its gas reserves stored in permanent tanks. It is easy to visualize the dire distress of the situation. Wells number 5 and 6 proved to be so nearly non-productive as to afford little help. The power company was on the heels of Industrial, which, in turn, was urging Bristol to remedy things and relieve it by beginning the drilling of another well. Industrial wrote Bristol on June 23, 1941, calling its attention to its obligations under the agreements, already noted, and reciting that it had been informed of the conditions by repeated notices of its defaults and that it had been obliged to stop deliveries to certain of its consumers and of the fact that the power company had been compelled to draw upon its storage gas. Industrial further recited that it had learned that Bristol was at that time drilling a well (number 7) and even if that proved to be an average well for the field, still the supply from all the wells in operation, including the one in

course of drilling, would be totally inadequate to enable it to furnish the required quantity of gas to the power company and in its other markets during the approaching winter. The letter, therefore, was to notify Bristol that unless, within 10 days, it should receive notice in writing that Bristol would immediately commence, and complete with due diligence, the drilling of another well in order to cure the situation it, Industrial, would itself begin the drilling of a well on the aforesaid oil and gas leases at the cost of Bristol, such cost so paid to be treated as advances in payment for gas to be delivered, and the repayment thereof would be made in accordance with the provisions of the fourth paragraph of the supplemental agreement. This fourth paragraph provided for the repayment in the same manner and method that applied to the repayment of the sum of $12,000 previously advanced by Industrial, subordinated, however, to the payment of that previous advancement and to the payment of the Adams notes, which have been heretofore referred to.

Bristol, in subsequent letters, denied that it was or had been in default and protested the drilling of another well at its expense and maintaining that it was then actually beyond its contract requirements and emphasized its position that under the supplemental agreement it was only required to commence and complete additional wells *one at a time.*

A voluminous correspondence ensued between the parties, extending well into the fall of 1941, in which each side insisted upon the correctness of its own interpretation and construction of their contractual relations but with no other result than the suit in chancery, which we are now considering, instituted by Elkins against both Bristol and Industrial as defendants, asking the court to determine the liens and priorities of the two deeds of trusts and to decide whether Industrial was entitled to charge Bristol with the cost of well No. 8, and if so whether it would be entitled to a lien or charge against any part of Bristol's property, and if so what would be the status thereof as to priority. It asked also that both agreements be cancelled and removed as a cloud upon

the title of Bristol and that the deeds of trust be declared to have priority over the claims asserted by Industrial, etc.

It is well to say now that there was another deed of trust dated May 31, 1941 from Bristol to Donald T. Stant, Trustee, securing a note of some $25,000 to Elkins and other monies advanced by him aggregating the sum of $29,911.90. This is the second deed of trust executed by Bristol subjecting its property to the payment of the indebtedness recited.

The bill filed in the suit recited the provisions of the agreements and the history of the matters between or among Elkins, Bristol and Industrial and reflecting Elkins' interpretation of them. Bristol filed its answer admitting the allegations of the bill and setting forth certain sums alleged to be due to it by Industrial and protesting the authority of Industrial to continue appropriating its gas and refusing to pay for it under its contractual covenants and urging the fact of its cancellation of the contracts, which was in accordance with the terms thereof relating to such right.

Two amended and supplemental bills were filed by Bristol seeking among other things to enjoin the power company from making further payments to Industrial. The power company filed a *pro forma* answer submitting its interests to the care of the court. Industrial filed its answer denying or explaining each paragraph of the bill *seriatim*, in which it set forth its interpretation of the contractual relations existing and its construction of its rights as opposed to those of Bristol. It affirmed its authority for its actions and asked for alternate relief and to that extent its answer to be treated as a cross-bill. Elkins and Bristol filed their answer to the cross-bill in which Bristol, among other things, accentuated its right to have the court cancel the contracts.

Evidence was taken in open court on the trial of the case on April 1, 1942. The court entered its decree on June 5, 1942, in which it adjudged that the indebtedness secured by the deed of trust from Elkins to Hedges and Hodges, Trustees, had been fully paid so far as the rights of Industrial

Gas Corporation were concerned and the lien thereof was discharged. It further adjudged that Industrial had a lien under the two agreements between it and Bristol for the repayment of the cost of drilling and completing well No. 8 prior in dignity of lien to the lien of the deed of trust from Bristol to Stant, Trustee, and further adjudging that the monthly payments for gas, after paying over to Bristol the amount of lease rentals, taxes, etc., might be retained by Industrial and applied to the repayment of such costs, as provided by paragraph five of the principal agreement and paragraph four of the supplemental agreement, such deductions to commence with the payment due January 20, 1942, for gas purchased during the month of December, 1941, and accordingly further adjudged that Bristol recover of Industrial the sum of $2,764.50, being the amount due for gas purchased during the months of September, October and November, 1941, with interest from the respective due dates, and provided for the payment by Industrial to Bristol for lease rentals, taxes, operating labor and repairs provided the gas purchased by Industrial was sufficient for such purpose, and retain the balance of the monthly amount, if any, and credit same upon the cost of drilling well No. 8 and continue so to do until such cost was repaid in full. The court further adjudged that the two agreements are subsisting and binding obligations between the parties and that the lien of the deed of trust from Bristol to Stant, Trustee, of May 3, 1941, is subordinate and subject to all rights and interests acquired by Industrial under the two agreements. The injunction prayed for was denied. It was further adjudged that Elkins and Bristol and the power company recover of Industrial the costs of the case thus far accrued.

On the same date the court filed its written opinion setting forth its reasons for its decision.

Elkins, the complainant, alleges three assignments of error.

First: The court erred in holding that Industrial has a lien under the two agreements for repayment of the costs of drilling well No. 8 prior to the May 31, 1941, deed of trust and in the holdings incidental thereto.

Second: The court erred in holding that the $12,000 Adams notes secured by the Hedges and Hodges deed of trust had been paid and the lien discharged, and in failing to hold that Elkins is the holder thereof and entitled to the benefit of the lien.

Third: The court should have declared the contracts properly cancelled, and removed them as a cloud upon Bristol's title.

Addressing myself to the first assignment of error, it is my opinion that the learned chancellor's holding and his reasons therefor are eminently sound. There is no question about the fact that the drilling of well No. 8 was out of turn. The chancellor held so and gave to Bristol the gas money paid by Industrial for the months of September, October and November, 1941, with interest, which covered the period between the first withholding of money and the time that Bristol would have been obliged, under the terms of the contract, to assume the burden of well No. 8. The court was mindful of the obligation of Bristol fixed by the terms of the first clause of the supplemental agreement to drill all additional wells thereunder only "one at a time." That qualification written in plain terms was obligatory. It would have been Bristol's bounden duty sooner or later to drill well No. 8 at its own costs. The only question was the time when it should be done and the court's decree adjusted the matter in a highly satisfactory way.

As to the action of the court in the matter of the priority of lien for the cost of drilling this well over the deed of trust of May 31, 1941, it is sufficient to say that the fourth clause of the supplemental agreement and the fifth clause of the principal agreement contains provisions which fix the rights of Industrial as to the cost of drilling, equipping, shooting and completing the wells required to be furnished by it and gave to it priority over existing lien indebtedness for the repayment of such costs from the sales of gas by Bristol, subject to the exceptions incorporated in the supplemental agreement, and the deed of trust of May 31, 1941, is not one of them.

It will be noted that the date of the principal agreement is November 29, 1937, and that of the supplemental agreement is December 13, 1938. Industrial's understanding of its rights, modified by the court's ruling as to the time of drilling well No. 8, is in harmony with the provisions of the said clauses, qualified, however, by my construction of the priority lien feature embraced in the exceptions last referred to.

I find greater difficulty in consideration of the second assignment of error, which brings under review the action of the court in holding that the Adams notes secured by the Hedges and Hodges deed of trust had been paid and the lien discharged and therefore Elkins' interest in them ceased to exist.

It will be remembered that Elkins conceived and began the operation of developing a gas field in southwest Virginia. It is an expensive undertaking. Such an enterprise cannot be consummated without the expenditure of large monies. He was confronted at all times with this problem. He used his own funds liberally and had to borrow additional sums. He executed a deed of trust on April 10, 1937, conveying all of his Virginia gas properties to secure the payment of money advanced by John C. Adams & Co., represented by two notes aggregating $12,000, payable to the said company, which notes were signed by Elkins.

His assignment to Bristol was subsequent to this deed of trust and it was made subject to it by express terms.

After this transaction Bristol carried the two notes on its books as "notes payable." There was never any question about its corporate liability on account of them until their status was challenged in this proceeding by Industrial.

In every written paper which has been introduced in the controversy, their existence and validity as prior liens against Bristol has been recognized and emphasized. As we have seen the Fourth Clause of the supplemental agreement, which had for its object the securing of Industrial in its advancements of the cost of drilling necessary wells, ex-

pressly made its operation and effect subject and subordinated to the following exception:

"(b)  to the payment in full, in the manner hereinafter provided, of the note or notes payable to the order of John C. Adams & Co., Inc., of Delaware, and interest thereon, secured by a certain deed of trust dated April 10, 1937, from Davis Elkins to Grover F. Hedges and Arthur B. Hodgee, Trustees, of record in the Clerk's Office of Scott County, Virginia, in Deed Book 98, page 66, and in the Clerk's Office of Washington County, Virginia, in Deed Book 165, page 39, to the lien of which said deed of trust the Principal Agreement and this Supplemental Agreement are subject. Payment of said note or notes, and interest thereon, shall be made as follows: Buyer shall pay to John C. Adams & Co., Inc., of Delaware the total price for gas purchased provided to be paid to Seller under the provisions of paragraph 3 of the Principal Agreement, until said note or notes, and interest thereon shall have been thereby or otherwise paid in full; and for said purpose, but subject to the provisions of sub-paragraph (a) above, Seller hereby assigns, transfers and sets over unto the said John C. Adams & Co., Inc., of Delaware, said total price for gas purchased, together with all rights of the Seller in respect thereto, until said note or notes, and interest thereon shall have been thereby or otherwise paid in full."

It is here seen that the provisions of this exception, to which Industrial was a party signatory, not only make Industrial's rights subject and subordinate to the lien of the Adams notes but it actually assigns, transfers and sets over to John C. Adams & Co., the payee of the notes, the total price for gas purchased, with all the rights of the seller (Bristol) in respect thereto, until said notes are paid in full. Could there have been a more definite and unmistakable recognition of the notes and their tenor and effect?

Not only this, but as recently as the 31st of May, 1941, the date of the second deed of trust by Bristol to Stant, trustee, the priority in dignity of lien, of the Adams notes, is again solemnly recognized. The trust deed is made sub-

ject to the Adams notes and here is this recital, " * * * the payment of which, for a valuable consideration, was later expressly assumed by the first party (Bristol), later paid by the said Davis Elkins, then secondarily liable thereon, and now held by him."

This was before the controversy with Industrial assumed virulent proportions and it will be noted that Davis Elkins was not a party to this deed of trust.

How could Bristol have been advantaged by making this recital of alleged fact if it was untrue?

Bristol's sole purpose was to keep the record straight by again fixing the liability for the Adams notes where it belonged.

There can be no reasonable doubt that after the assignment of the gas properties by Elkins to Bristol, subject to the notes, Bristol became primarily liable for their payment. The burden of Elkins, the maker, was reduced to that of secondary liability. The payee, John C. Adams & Co., used them for the purpose of borrowing money, which was done through an Arkansas bank. Elkins became aware of their whereabouts, and knowing that Bristol could not pay them, he wrote the foreign bank and had it send them to a Bristol bank for collection. He then paid them and requested the payee to endorse them to him by an endorsement which carried a legend or statement of the facts of their relation to him (Elkins). After a considerable delay and much correspondence and consultation with the payee's attorney, which carried the matter to a time when the differences between Bristol and Industrial had become acute and intense, Adams refused to endorse them over to Elkins. It developed from the record that Industrial was largely owned by Adams and that reveals a relationship similar to that expatiated upon by Industrial as existing between Elkins and Bristol. For whatever it may be worth, it can be said that honors are very nearly even on that score.

It is not hard to understand Elkins' desire that the notes should be paid, and by himself, and if the payee, Adams, had endorsed them to him he would have stood in Adams' shoes,

without question, and he could have indulged Bristol in the matter of their payment and his security would not have been endangered at all. Then too, it was doubtless disagreeable to him to have notes for that amount of money, of which he was the maker and ostensibly the debtor, traveling about the country, as collateral, subject to the scrutiny of bank examiners and others who might be curious. The upshot is that he paid the notes when he was not primarily liable and we know of no reason, certainly there is none in equity, why the arbitrary refusal of the payee to endorse them over, should defeat Elkins' just claim or impair its lien status.

Strangely enough, as I see it, the learned chancellor held that Bristol had paid the notes to Elkins and therefore they were extinguished and done with. The evidence of Mr. Burk, whose identity I have already noted, was directly to the contrary. On this point he testified as follows:

"Q. Now, Mr. Burk, as far as Bristol and Elkins are concerned, have these Adams notes ever been paid by Bristol the way you have carried them on your records?

"A. They have never been paid. They represent an advance made by the Senator to the company, and the company has never reimbursed him for it."

The testimony is uncontradicted.

The chancellor arrived at the conclusion that Bristol had paid Elkins by employing the ledger sheet of an account between Elkins and the field operations in Virginia and he, erroneously, I think, used an item of $80,818.34 which was credited to Elkins on September 1, 1935, which was ten months before the assignment to the corporation and before the organization of the Bristol corporation, so that it could hardly have had any connection with the issue with which we are concerned. Again, there are some rather indistinct pencil marks at the entry which indicate that the item had to do with some interests of Elkins in Roane county, West Virginia, which, I think, is quite foreign to the inquiry here. I think there is nothing to do but to shunt aside the ledger sheets because none of the attorneys were familiar enough

with them to satisfactorily explain them. The witnesses were not asked to do so. Mr. Burk actually kept the books and no definite explanation came from him. As we have said, the interrogatories to him were not such as to elicit this information. Really they are quite inexplicable.

The Court, in its opinion, said that "the ledger sheets of the acount between Elkins and Bristol show that Bristol credited Elkins with $80,818 for the assets, but when it enters the charge against him for the stock, it only charges him with $50,000. The two entries must balance. Since there is a difference of $30,818 then all of the debit balances against Bristol at the end of each year should be decreased by $30,818."

In the first place the court is in error as to the ledger sheets being an account between Elkins and Bristol until a date ten months later than the entry. As we have seen, the $80,818.34 item was ten months before there was such entity as Bristol and the entry, as we have said, according to the pencil notation, had to do with a separate and distinct interest of Elkins in Roane County, West Virginia. The court ended its analysis with this observation, "Since the amount of the Adams notes with interest, $12,145.99, has been credited to Elkins in this account as of June 22, 1939, any supposed indebtedness of Bristol to Elkins thereon has been paid."

This accounts for the fallacy of the court's reasoning. He undertakes to make the two entries balance, that is $80,818 and $50,000. He makes the perfectly manifest statement that they are out of balance by the difference between them, which is $30,818, and then he handles that in his own way to attain the end at which he arrived. And his error is accentuated by the fact that three months after the last entry cited by him as justifying his conclusion Bristol, in the deed of trust of May 31, 1941, acknowledged the existence of the Adams notes and deed of trust as a valid and existing lien against its properties and superior in dignity to the indebtedness secured by the said deed of trust. This, of course, is in addition to the positive testimony of Mr. Burk, the

treasurer of Bristol, that Elkins has never been paid on account of them.

The court reasons that there are at least three theories upon which the notes must be treated as paid and the lien securing them discharged as between Elkins and Industrial. It says the notes were, under the facts, actually paid and discharged by Elkins and that was equivalent to payment by Bristol, because, he says, that Bristol is a mere business conduit of Elkins, "his *alter ego*", and on that account it will disregard the corporate entity of Bristol for the purpose of this transaction.

A recent expression on this subject comes from the Supreme Court of the United States in the case of *Moline Properties* v. *Commissioner of Internal Revenue*, 319 U. S. 436. 63 S. Ct. 1132 (June 1, 1943). There it is said:

"The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. *New Colonial Co.* v. *Helvering*, 292 U. S. 435, 442; *Deputy* v. *duPont*, 308 U. S. 488, 494. In *Burnet* v. *Commonwealth Imp. Co.*, 287 U. S. 415, this court appraised the relation between a corporation and its sole stockholder and held taxable to the corporation a profit on a sale to its stockholder. This was because the taxpayer had adopted the corporate form for the purposes of his own. The choice of the advantages of incorporation to do business, it was held, required the acceptance of the tax disadvantage."

I think the court was in error in ignoring the corporate entity of Bristol as separate and distinct from Elkins in view of the dealings between them and in the face of the provisions of the fourth clause of the supplemental agreement, in which Industrial recognized the obligation of Bristol as to the notes and the security and therein agreed to the assign-

ment of the total price for gas purchased to the payment of the said notes. It is true that the notes were then in the hands of Industrial's "business conduit" and *"alter ego"* John C. Adams & Co., Inc. Their legal status was not changed by the fact that the notes passed into the hands of Elkins, who paid them, and was entitled to the endorsation assignment that he requested. This would no doubt have been accorded him if he had demanded it as a condition of his payment of them.

My conclusion is that the Adams notes constitute a valid and binding indebtedness of Bristol to Elkins and that the lien thereof is superior in dignity to the claims of Industrial against Bristol.

I think the chancellor's holding as to the principal and supplementary agreements being subsisting and binding contracts between Bristol and Industrial is sound. It would be highly inequitable to allow them to be cancelled when the parties have acted under them for all these years. They have shaped their conduct and grown to a state of usefulness and public necessity under their provisions and to allow Bristol to cancel them simply because Industrial saw fit to assert a claim, which was to it genuine and just, would be to countenance a miscarriage of justice. If there were any doubt about whether the contracts should stand it should be resolved in favor of their subsistence as serving the public needs. The patent intent of the scheme on the one hand was the production of gas, on the other its distribution to the public. Both parties have spent large sums in the matter of this development, Elkins to the extent of approximately $100,000, and Industrial $49,000 in the one item of the pipe line from the point of production to that of distribution.

The law wisely lends its aid to the extent of sustaining contracts, fairly and freely made, particularly when serving a public need, rather than doing away with them. It is said in American Jurisprudence, volume 12, section 251, page 795, "Where an agreement is capable of being so

interpreted as to provide for a. forfeiture or as not so to provide, the former interpretation will be given.

"All parts of the agreement will be so interpreted as to give force and validity to all of them and to all the language used where that is possible. Comparatively unimportant parts or provisions which may be severed from the agreement without impairing its effect or changing its character will be suppressed or subordinated if in that way, and only in that way, the agreement can be sustained and enforced."

What I have said with respect to the trial court's opinion is of equal application and force as to the majority opinion with which I am absolutely out of accord in the respects indicated.

HUDGINS and EGGLESTON, JJ., concur in this dissent.